Filed 7/7/23  In re Giovanni G. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Giovanni G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E080858 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J288561, J288562) |
| v. | OPINION |
| E.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Tracy M. De Soto, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Jessica L. Morgan, Deputy County Counsel, for Plaintiff and Respondent.

1

In this dependency proceeding, E.G. (father) appeals from the termination of his parental rights to his minor sons, Jacob G. and Giovanni G. (collectively, the children). Father argues that the juvenile court erred by failing to apply the beneficial parental relationship exception under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) (section 366.26(c)(1)(B)(i)) (unlabeled statutory references are to this code). We affirm.

BACKGROUND

The family came to the attention of San Bernardino County Children and Family Services (CFS) in March 2021, when Jacob was nine years old and Giovanni was three years old. CFS received a referral from paternal grandmother, who was concerned about the children's safety because of the drug use of father and G.M. (mother) (collectively, parents). The children and parents had lived in paternal grandmother's home but moved out after paternal grandmother told mother to leave because of mother's drug use.

While the family was living at paternal grandmother's house in February 2021, mother's boyfriend had fired several gunshots at father outside of the house. Mother was present when the shooting occurred. Mother had taken one of the children into the house immediately before the shooting. Law enforcement arrested mother and her boyfriend.

A social worker investigated the referral and found father and the children living at maternal grandmother's house. The children were wearing dirty clothing, Giovanni's face was dirty, and Jacob had not attended school for several weeks. Father and Jacob could not explain why Jacob had not been to school. Jacob reported that father

2

disciplined Giovanni by "smack[ing]" Giovanni in the arm or the stomach. Father denied that mother had been arrested and denied that mother used drugs but admitted that he used marijuana.

CFS took both children into protective custody pursuant to a warrant. CFS filed a petition under subdivisions (b)(1) and (g) of section 300, alleging that the children were at substantial risk of serious physical harm because of parents' substance abuse and history of domestic violence and mother's inability to support the children due to her incarceration. Mother is not a party to this appeal.

The juvenile court detained the children in the home of Ms. C, a nonrelative caregiver.[1] The court ordered weekly, two-hour supervised visits for father and gave CFS discretion to liberalize the frequency and duration of the visits.

In the jurisdiction and disposition report, CFS reported that father had not visited the children. Ms. C was in the process of scheduling the children's wellness exams.

The court held the jurisdiction and disposition hearing in April 2021. The court sustained the allegations in the petition, removed the children from parents' custody, declared the children dependents of the court, and ordered reunification services for parents. The court found father to be the children's presumed parent.

In the six-month status review reported filed in October 2021, CFS reported that at Giovanni's initial medical examination in April 2021 he was underweight and diagnosed

---

[1]    In its reports, CFS occasionally mistakenly refers to the children's caregiver as Ms. R rather than Ms. C, but the record confirms that the children were placed in only one home (Ms. C's) after being removed.

with failure to thrive. By June 2021, Giovanni had "gained an appropriate amount of weight," and his weight was no longer a medical concern. In addition, Giovanni had numerous teeth extracted because he had 20 cavities along with "multiple decay and ab[s]cesses."

Jacob was attending fourth grade. In April 2021, Jacob was reading at a preschool level. In October 2021, Jacob's reading had improved so that he was reading at almost a first-grade level. He also had "85% accuracy in spelling tests." Jacob's teacher reported that he was "putting a lot of effort into his learning" and was "a role model student, winning an award in math and another in integrity."

When initially placed with Ms. C, Giovanni was angry and dependent on Jacob for meeting his needs. Jacob acted like Giovanni's "primary caregiver." Giovanni was making progress in treatment. Ms. C reported that Giovanni's "tantrums [were] reduced to approximately one time daily."

During the reporting period, Ms. C supervised father's weekly visits with the children. CFS had increased the visits to twice weekly, two-hour supervised visits. The children enjoyed spending time with father, who brought supplies and activities to visits to engage with the children. Ms. C reported that father had "no boundaries with the children."

At the six-month status review hearing in October 2021, the court ordered continued reunification services for father.

CFS filed the 12-month status review report in March 2022. The children remained placed with Ms. C. CFS recommended terminating father's reunification services. Father had completed services but lacked insight into understanding domestic violence and how it had traumatized the children. Father's substance abuse issues remained unresolved. CFS suspected that father continued to have a relationship with mother.

During the reporting period, father visited the children once weekly for six hours. Ms. C supervised the visits and reported that father's "behaviors" were improving but that he still needed "boundaries and structure." Giovanni hit father, and father did not redirect Giovanni. Father struggled to follow "a structured schedule." He did not understand that dinnertime was "not time to play." When Jacob needed help with homework, father did not help and instead played with Giovanni, which caused Jacob to be frustrated. Jacob was not allowed to play until he finished his homework.

Ms. C reported that Giovanni had temper tantrums when visiting with father but no longer had temper tantrums at home. At home, Giovanni used "his words to express what he [was] feeling" when he felt frustrated.

The social worker explained to father the concerns that Ms. C had about father's visits. Father denied not helping Jacob with homework and explained that Giovanni would get upset if father did not play with Giovanni.

In an addendum report filed in April 2022, CFS reported that father continued "to be a 'buddy' to" the children during visits and "struggle[d] with the role of a parent."

5

Giovanni continued to have temper tantrums during father's visits and ran into a parking lot during one visit.

The court held the contested 12-month status review hearing the following month. CFS, the children's counsel, and father's counsel agreed that father should receive continued reunification services, which the court ordered.

In September 2022, CFS filed the 18-month status review report and an addendum report. CFS recommended terminating father's reunification services and setting a selection and implementation hearing under section 366.26. CFS reported that father continued to lack insight into why the children had been removed and how domestic violence between him and mother had affected the children.

During the reporting period, CFS had liberalized father's visits so that he visited with the children three times per week for two hours. During one visit in June 2022, father told the children that they would be living together in a house he was going to rent. Ms. C redirected father. After the visit, Giovanni had a "'meltdown'" and said "he was tired of living in [Ms. C's] home and was going home with" father. Ms. C reported that Jacob had also had "several 'meltdowns'" related to father's promises to the children that he was getting housing for them all to live in and that he would take them to Disneyland after they reunified.

Ms. C initially reported to CFS that father had made "small improvements" and appeared to be "making more of an effort to parent the children." In July 2022, Ms. C reported that she was frustrated with father's visits. According to Ms. C, father continued

6

to "'mess around in the visits.'" Ms. C described father "as a child trying to be an adult" and as being "not consistent in his parenting." For example, at a doctor's appointment for Giovanni, father "showed no interest in speaking with the doctor." Father played with the children in the lobby while Ms. C spoke with the doctor. Father similarly played in the lobby at Jacob's psychiatrist appointment. Ms. C believed that father appeared to be "trying to do the right thing, but then returns to being one of the 'kids.'" Giovanni had "temper tantrums" while visiting with father but otherwise had none.

Ms. C described one visit that had occurred at a McDonald's restaurant a couple of weeks earlier. The children were being loud and appeared to be "annoying people," but father did not redirect them. Father accompanied the children to the restroom but did not return in a timely manner, which concerned Ms. C. A male employee opened the restroom door for Ms. C after she heard yelling and screaming. Giovanni was "on the floor, surrounded by poop and [father] was trying to clean it up." Giovanni had "pooped outside the toilet and was playing in it," and Jacob had "joined in."

The social worker asked father about the McDonald's incident. Father said "that he was working with Giovanni to wipe himself," but Giovanni had "defecated outside the toilet" and stepped "in the poop." Father had to clean the toilet, the floor, Giovanni, and Giovanni's shoes. Father explained that "Jacob laughs when there is farting or poop involved."

After speaking with father about the incident, the social worker observed a visit between father and the children at a restaurant. Father bought pizza for the children and

7

played games with them. The children were well-behaved. Father took the children to the restroom without incident.

At the 18-month status review hearing in September 2022, the juvenile court terminated father's reunification services and set a selection and implementation hearing under section 366.26.

In preparation for the section 366.26 hearing, the social worker reported that the children appeared "adjusted and comfortable in" Ms. C's home, where they had lived since March 2021. Ms. C described her relationship with the children as "'very good'" and loving. Ms. C shared "a strong connection" with the children, and they gave her "'a lot of love.'" Mr. C described his relationship with the children as "'good'" and stable. Mr. C said that the children "identify with him, and they share common interests." Mr. and Ms. C wanted to adopt the children.

Asked how he felt about being adopted, Jacob said that he felt "'happy' about being able to stay with the prospective adoptive parents." Jacob was 11 years old. The social worker believed that Jacob understood what it meant to be adopted in that he understood that Mr. and Ms. C would "be his 'forever' home and family." Jacob viewed Mr. and Ms. C as family. Jacob was in sixth grade and reading at a fourth grade level. Jacob's goal was to read at a seventh grade level by the end of the school year.

Giovanni was five years old and did not "understand the concept of adoption." Giovanni "was 'afraid' about being adopted because he did not want to go to a 'new home.'" When the social worker explained to Giovanni that he would remain with Mr.

and Ms. C and that they would "be his forever home and family, Giovanni appeared to be relieved." Giovanni did not understand that he would not be able to reunify with father.

Both Jacob and Giovanni described Mr. and Ms. C to their "peers or others" as their "mom and dad" and described Mr. and Ms. C's children to others as their siblings. The children appeared "adjusted and comfortable" in Mr. and Ms. C's home. Mr. and Ms. C "reported improvements in the children's initial behaviors." Jacob no longer acted as Giovanni's parent.

CFS recommended terminating father's parental rights and freeing the children for adoption. The social worker opined that terminating "[p]arental rights would not be detrimental to [the] children."

The court held the contested section 366.26 hearing in March 2023. The court admitted into evidence and considered CFS's reports and a bonding study report prepared by Dr. Robert E. Brodie II, Ph.D., a clinical psychologist. Father and Dr. Brodie testified. The parties stipulated that Dr. Brodie was an expert, and the court accepted the stipulation.

Dr. Brodie testified about the bonding study that he conducted of father and the children in February 2023. Dr. Brodie interviewed Jacob, Giovanni, Ms. C, and father separately and observed a 45-minute visit with father and the children at a fast food restaurant. When the children arrived at the restaurant, father and Jacob were excited to see one another. Giovanni was sleeping in Ms. C's arms. During the study, father bought the children food, helped Giovanni prepare his food, and encouraged Giovanni to

finish his meal.  Father brought a card game and helped the children make a craft.  Father was patient with the children.  The children smiled throughout the visit "and appeared very comfortable with their father."  Dr. Brodie testified that father occupied a "parental role" during the visit.

Dr. Brodie said that Jacob understood what adoption means but that it was difficult to assess Jacob's wishes because Jacob appeared to answer questions "in a manner that [Jacob] believe[d] would please the questioner."  Jacob initially told Dr. Brodie that he wanted "'to go back with [his] dad.'"  But Jacob then amended his answer to say that "he was not sure," even though he loved father, because Ms. C "takes good care of him."  Jacob could not answer whether he wanted overnight visits with father.  Giovanni was nervous when he spoke with Dr. Brodie and did not provide Dr. Brodie with any meaningful information about Giovanni's relationship with father.

In the report, Dr. Brodie opined that both Jacob and Giovanni were "well connected" and "bonded" with father and shared "a positive and secure attachment" with him.  At the visit observed by Dr. Brodie, the children were excited to see father and comfortable with him.  Giovanni viewed father "as a safety figure" and had "laid comfortably on" father's chest.  Dr. Brodie concluded the report with his opinion "that both children have a secure attachment to their father and it will be in the best interest of the children to continue the reunification process."

In an addendum report filed the day of the hearing, CFS addressed Dr. Brodie's report and continued to recommend terminating father's parental rights.  CFS opined that

10

Dr. Brodie's opinion was based on one "very brief observation[] in a controlled environment," in which father's ability to parent the children in a difficult situation or otherwise to meet their needs was not challenged.

Dr. Brodie testified that father "seemed well connected" with the children, so the children "would benefit from continuing th[eir] relationship with" him. Dr. Brodie also believed that it would be detrimental to the children to terminate father's parental rights because of the "strong connection" the children had with father. On cross-examination, Dr. Brodie confirmed that "no part of [his] assessment was directed at weighing the relative benefits of preserving the parent-child relationship versus the benefits that the children may gain from adoption."

Father testified that he had attended all of the scheduled visits with the children. The children were "happy and excited" to see father at the beginning of visits but "get sad' when visits end. Both children acted affectionately toward father. Giovanni "constantly" asked when he would "be able to come home." During visits, father played card games with the children and asked them about school, homework, and whether they were sleeping and eating. Father said that the children referred to him as "Dad" and "Mom."

The juvenile court found the children likely to be adopted, and the court terminated father's parental rights. Applying the elements of the parental bond exception as set forth in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), the court found that father "clearly" satisfied the first element of regular visitation. As to the second element,

11

the court found that the children had "a positive emotional attachment" to father but that it was "questionable" whether the attachment was substantial. As to the third element, the court found that father had not carried his burden of showing "a substantial attachment or that termination of parental rights would be so detrimental that the Court should implement a less permanent plan." The court recognized that the children, and particularly Jacob as the older child, would suffer "some detriment" from the termination of father's parental rights, but the court did not believe that the detriment outweighed "the benefits and stability that the adoptive home provides." The court indicated that the children had been out of parents' custody for two years and "found a home where they can be together—permanently together in a stable placement."

Concerning the second and third elements, the court reasoned that Jacob's statements at nearly 12 years old "undermine both of those prongs in that he does understand what adoption means and he has expressed a number of times that he does wish to be adopted." As to Giovanni, the court found it "telling" that Giovanni's anxiety decreased when he was told that adoption meant that he would stay with Ms. C.

## DISCUSSION

Father argues that the juvenile court erred by failing to apply the beneficial parental relationship exception under section 366.26(c)(1)(B)(i). We are not persuaded.

When the juvenile court finds that a dependent child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless it finds that adoption would be detrimental to the child under one of several exceptions.

12

(§ 366.26, subd. (c)(1); *Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.)  The "'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'"  (*Caden C.*, at p. 631, quoting *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Under the beneficial parental relationship exception, the parent bears the burden of proving three elements by a preponderance of the evidence:  "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child."  (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, 636, italics omitted; § 366.26(c)(1)(B)(i).)

We review for substantial evidence the juvenile court's findings on whether the parent has regularly visited and whether a beneficial parental relationship exists.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)  Whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship is reviewed for abuse of discretion.  (*Id.* at p. 640.)  But we review any factual findings underlying that decision for substantial evidence.  (*Ibid.*)  "A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.""""  (*Id.* at p. 641.)  We have no authority to substitute our decision for that of the juvenile court """"[w]hen two or more inferences can reasonably be deduced from the facts.""""  (*Ibid.*)

In determining whether the exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security

13

and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); *Caden C.*, *supra*, 11 Cal.5th at p. 633.)

When "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  The parent must show that his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, at p. 575.)  "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on other grounds in *Caden C.*, at pp. 637, 638, fns. 6, 7.)  The court may consider issues ranging from "the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be." (*Caden C.,* at p. 640.)  The court must also assess "how a prospective adoptive placement may offset and even counterbalance those harms," and in that regard the court may consider "findings ranging from specific

14

benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told." (*Ibid.*)

The juvenile court found, it is undisputed, and we agree that father maintained regular visitation and contact with the children. We assume for the sake of argument that the children would benefit from a continued relationship with father. The remaining element is whether the children shared such a "substantial, positive attachment" to father (*Caden C.*, *supra*, 11 Cal.5th at p. 636) that the harm in severing the parental relationship would "outweigh[] 'the security and the sense of belonging a new family could confer'" (*id.* at p. 633).

The juvenile court did not abuse its discretion by determining that any benefits derived from the children's relationship with father did not outweigh the benefit of stability through adoption. The record reflects that the children enjoyed visiting with father and loved him. But "[a] parent must show more than frequent and loving contact or pleasant visits." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555 (*C.F.*).) Although Dr. Brodie opined that the children have a strong, positive connection with father, there was no evidence that the relationship was so significant as to outweigh the security and stability of an adoptive home. (Cf. *Caden C.*, *supra*, 11 Cal.5th at pp. 633-634 ["When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent"]; *id.* at p. 635 [when a child has "'very strong ties'" with a parent and termination of parental rights "'is likely to be

harmful to the child, courts should retain parental ties if desired by both the parents and the child'"].) The relationship father enjoyed with the children during their visits is not sufficient to demonstrate that father and the children shared such a substantial, positive emotional attachment that terminating father's parental rights would greatly harm the children.

Father did not present any evidence that the security and stability of a new home would be outweighed by the loss of the relationship with father. Dr. Brodie opined that termination of father's parental rights would be detrimental to the children. But Dr. Brodie did not analyze whether the possible detriment suffered by the children in severing their relationship with father would be so great as to outweigh the benefit of adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

Moreover, father said that the children were sad when visits ended, but there was no evidence that the children's sadness at the end of visits otherwise had significant or lasting effects on their behavior or general well-being. (Cf. *Caden C.*, *supra*, 11 Cal.5th at p. 633 [losing the parental relationship might result in "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression"].) While Ms. C reported that both Jacob and Giovanni had meltdowns after visiting with father, the meltdowns occurred only after father promised the children that they would be living together soon and would go to Disneyland. There is no evidence that the meltdowns were anything other than isolated incidents related to father's inappropriate promises during visits. The evidence demonstrates that Giovanni stopped

having any temper tantrums while at Mr. and Ms. C's home and only had them when visiting with father. The evidence otherwise shows that the children were thriving in the placement with Mr. and Ms. C, with whom they had lived for two years.

Father does not explain how the juvenile court abused its discretion by determining that the stability and security of adoption outweighed any detriment the children might experience from severing the relationship with father. Instead, Father merely points out evidence that would support a contrary conclusion, namely, Dr. Brodie's opinion about possible detriment. But that evidence does not show that the juvenile court abused its discretion "'"'by making an arbitrary, capricious, or patently absurd determination.'"'" (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) When the evidence supports two or more reasonable inferences, we do not substitute our judgment for the judgment of the lower court. (*Ibid.*)

Father also argues that this case is similar to *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*). *S.B.* concluded that the juvenile court erred by finding that the beneficial parental relationship exception did not apply, because "the only reasonable inference" from the record was that the child "would be greatly harmed by the loss of her significant, positive relationship with" the father. (*Id.* at p. 301.) The expert who conducted the bonding study opined that the child would suffer potential harm if the parental relationship were severed, and the social worker also acknowledged that the child would experience "some detriment" if the parental relationship were severed. (*Id.* at p. 295.) The social worker nevertheless recommended terminating the father's

parental rights "based in part on the [caregiving grandparents'] intent to continue [the father's] visits with" the child. (*Ibid.*) The juvenile court had similarly relied in part on the grandparents' promise to allow future visits, which *S.B.* found to be an improper consideration. (*Id.* at p. 300.)

Father's reliance on *S.B.* is misplaced. (See *C.F.*, *supra*, 193 Cal.App.4th at pp. 558-559 [same appellate court observing that "*S.B.* is confined to its extraordinary facts"]; Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2021) § 2.171[5][i][C], p. 2-694 [*S.B.* should be viewed as "the result of a very unique factual situation"].) Unlike in *S.B.*, the social worker here opined that the children would not suffer any detriment upon termination of parental rights, and the juvenile court did not rely, even in part, on any promised future visits with father that Mr. and Ms. C might allow. Moreover, in light of the conflicting evidence concerning the extent of any detriment that the children might suffer if father's parental rights were terminated, the record does not show that "the only reasonable inference" is that the children would be "greatly harmed" by the loss of the relationship with father. (*S.B.*, *supra*, 164 Cal.App.4th at p. 301.)

Finally, Father also contends that the juvenile court applied an incorrect standard by focusing on where the children wanted to live and not whether the parental relationship outweighed the benefits of adoption. The argument lacks merit. The court properly considered the children's feelings about being adopted by Mr. and Ms. C in

18

determining whether the stability of adoption would be outweighed by the detriment of losing the parental relationship. (*In re I.E.* (2023) 91 Cal.App.5th 683, 692-694.)

For all of these reasons, we conclude that the juvenile court did not abuse its discretion by concluding that the benefit the children would receive from adoption was not outweighed by any detriment they might suffer from the termination of father's parental rights.

DISPOSITION

The March 7, 2023, orders terminating parental rights as to Jacob and Giovanni are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

CODRINGTON
Acting P. J.
RAPHAEL
J.